# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

|  |  |  |
|---|---|---|
| HALDRUP USA CORP., | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. 1:15-CV-00136 |
| KINCAID EQUIPMENT MANUFACTURING, INC., and EMPRISE BANK, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendant Kincaid Equipment Manufacturing, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint or in the Alternative for Venue Transfer, filed on July 22, 2015 (DE #18). For the reasons set forth below, the Court **TRANSFERS** this case to the United States District Court for the District of Kansas, pursuant to 28 U.S.C. § 1406(a), and **DENIES AS MOOT** Kincaid's motion to dismiss (DE #18). The Clerk is hereby **ORDERED** to transfer this matter to the United States District Court for the District of Kansas.

Plaintiff Haldrup USA Corp. ("Haldrup") filed its Complaint on April 30, 2015, in Indiana state court. (DE #4.) After the case was removed to federal court, Haldrup amended the Complaint on July 17, 2015. (DE #16.) The Amended Complaint asserts three breach of contract claims (Counts I-III) and a claim seeking a preliminary and permanent injunction (Count IV) against Defendant Kincaid Equipment Manufacturing, Inc. ("Kincaid"). In response to the Amended Complaint, Kincaid moves to dismiss based on lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) and improper venue. In the alternative, Kincaid moves to transfer the case to the United States District Court for the District of Kansas pursuant to 28 U.S.C. § 1404(a) or 28 U.S.C. § 1406(a). (DE #18.) After the parties conducted discovery on the issue of specific personal jurisdiction, Haldrup filed its response to Kincaid's motion on February 26, 2016. (DE #37.) Kincaid filed its reply on March 4, 2016. (DE #38.)

## DISCUSSION

### Facts[1]

Haldrup is an Indiana corporation with its principal place of business in Wells County, Indiana. (DE #16 at ¶1.) Haldrup is

---

[1] If a defendant moves to dismiss a complaint pursuant to Rule 12(b)(2), the plaintiff bears the burden of demonstrating the

the successor in interest and assignee of certain rights of Haldrup GmbH, formerly known as Inotec Engineering GmbH ("Inotec"), a German business with its principal place of operation in Ilshofen, Germany. (DE #16 at ¶5, ¶14; #19-1 at ¶2.) Inotec is a manufacturer and seller of agricultural implements used in the area of field research. (DE #16 at ¶5.) Kincaid is a Kansas corporation with its principal place of business in Haven, Kansas. (*Id.* at ¶2.)

In 2012, Inotec sought to partner with a company based in the United States to introduce, import, and distribute Inotec's products into the United States market. (DE #16 at ¶6.) Inotec and Kincaid discussed a strategic plan to introduce Inotec's products to the United States, and in early May 2012, representatives of Kincaid traveled to Ilshofen, Germany, to negotiate terms of an agreement with Inotec. (*Id.* at ¶7; DE #19-1 at ¶6.) On May 3, 2012, Inotec and Kincaid entered into a Memorandum of Understanding ("MOU") whereby Kincaid agreed to introduce Inotec's products to "the North American market," and

_____

existence of jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003). When the court rules on such a motion based solely on written materials provided by the parties, the plaintiff "need only make out a *prima facie* case of personal jurisdiction. . . . In evaluating whether the *prima facie* standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Id.* (internal quotations and citations omitted). Therefore, any disputed facts have been resolved in Haldrup's favor.

develop sales of these products. (DE #16-1 at 1.) According to the MOU, Inotec's products were to be sold under the name Haldrup A/S ("Haldrup implements"). (*Id.*) The MOU also provided that Kincaid would buy certain "demo machines" and "act as importer of said machines." (*Id.*)

Pursuant to the MOU, Inotec sold a C85 plot combine to Kincaid on May 16, 2012 ("C85 combine"). (DE #16 at ¶9.) The order confirmation for the C85 combine states that the combine was manufactured in Germany, and delivered to Haven, Kansas. (DE #16-2.) Inotec delivered the C85 combine to Kincaid in Haven, Kansas, and Kincaid sent the full payment for the C85 combine to Inotec in Germany. (DE #19-1 at ¶8-¶9.) Kincaid modified the C85 combine, and used it as a demo machine for customers. (DE #16 at ¶10.) Kincaid's modifications and failure to properly maintain and care for the C85 combine allegedly impacted the combine's functionality. (*Id.* at ¶11.)

Pursuant to the MOU, Inotec also sold to Kincaid a CTS-95 twin plot combine on July 18, 2012, and a CTS-95 twin plot combine on February 6, 2013 ("CTS-95 combines"). (*Id.* at ¶9.) The CTS-95 combines were manufactured in Germany and delivered to Kincaid in Haven, Kansas. (DE #16-3; DE #16-4; DE #19-1 at 11, 14.) Kincaid allegedly modified the CTS-95 combines, but failed to pay the purchase price for them. (DE #16 at ¶12.) Under the terms of the order confirmations for the CTS-95 combines, Inotec retained

ownership interest in the CTS-95 combines until Kincaid paid the full purchase price. (*Id.* at ¶15; *see, e.g.,* DE #16-3 at 6.) The CTS-95 combines are currently located in Kansas. (DE #19-1 at ¶¶ 12, 15.)

Prior to 2013, Kincaid had sold equipment to a company called Tech Services, Inc. ("Tech Services"), which has offices in Bluffton, Indiana. (DE #37-3 at ¶3, ¶4.) In December 2012, Mike Mossberg ("Mossberg"), President of Tech Services, saw a Haldrup C85 combine at Kincaid's trade show booth in Chicago, Illinois. (*Id.* at ¶1; DE #37-2 at 3.) Tech Services was interested in purchasing a plow/harvester in 2013. (DE #37-3 at ¶5.) While it is unclear who contacted whom after the Chicago trade show, in May 2013, Kincaid brought the C85 combine to Indiana to perform a demonstration for Tech Services. (*Id.* at ¶7.) Mossberg attests that the C85 combine did not appear to be "field ready", and that it appeared to have received no service and only minimal maintenance before the demonstration. (*Id.* at ¶8, ¶12.) Tech Services attempted to operate the C85 combine in two fields in Indiana and two fields in Illinois, but the combine worked in only one of the four fields. (*Id.* at ¶9-¶11.) Kincaid brought the C85 combine to Bluffton, Indiana, for inspection and to determine the cause of its problems. (*Id.* at ¶16.) The C85 combine remained in Bluffton for more than one month. (*Id.* at ¶17.)

In December 2013, Andrew Blubaugh of Kincaid met with Mossberg at the Chicago trade show and invited him to travel to Europe to visit the Haldrup facility with Kincaid representatives. (*Id.* at ¶19-¶22.) Mossberg attests that after his visit to the Haldrup facility, he lacked confidence in Kincaid as a distributor of Haldrup's products because Kincaid's representatives did not appear to understand or have the ability to repair Haldrup implements. (*Id.* at ¶23-¶24.)

Between 2013 and 2015, Kincaid sold four Haldrup implements to three entities in Indiana: (1) a 7-Row Distributor to ABG Ag Services ("ABG") in Sheridan, Indiana; (2) a Thresher & Cleaner to Dow AgroSciences ("Dow") in West Lafayette, Indiana; and (3) two implements (a 6-Row Planter and a 4-Row Drill) to Purdue University/Elizabeth Rausch Purdue Agronomy Farm ("Purdue") in West Lafayette, Indiana. (DE #37-1 at 2-3.) Kincaid modified the Haldrup implements it sold to Purdue. (*Id.* at 3.)

On or about March 4, 2015, Inotec sent a demand letter to Kincaid regarding the matters asserted in the Amended Complaint, but did not mention its intent to assign its claims. (DE #19-1 at ¶16-¶17.) Kincaid retained legal counsel in Kansas to respond to Inotec's letter, and on April 3, 2015, Kincaid's counsel sent a letter to Inotec in Ilshofen, Germany. (*Id.* at ¶17, ¶18; DE #13-1.) In that letter, Kincaid refused a settlement offer proposed by Inotec, asserting that Inotec had breached the MOU, and that

there were "pervasive problems" with Haldrup implements, including the implements that Kincaid had sold to Purdue and other customers. (DE #13-1 at 1.)

On April 17, 2015, Inotec assigned to Haldrup its rights arising from its relationship with Kincaid, including the MOU and the CTS-95 combines. (DE #38-1.) Two weeks later, on April 30, 2015, Haldrup filed suit against Kincaid in Indiana state court. (DE #4.)[2] Kincaid learned of Inotec's assignment of claims to Haldrup when it was served with that complaint. (DE #19-1 at ¶20.) Kincaid had no dealings with Haldrup; all of Kincaid's dealings regarding the MOU and combine orders were with Inotec. (*Id.* at ¶5.) None of the dealings between Kincaid and Inotec occurred in Indiana. (*Id.*)

The Amended Complaint alleges that Kincaid failed to pay the amount due on the CTS-95 combines and failed to abide by the terms of the MOU. (DE #16, Counts I-III.) Haldrup also alleges that Kincaid's alterations and modifications to Haldrup implements were not authorized, that they have resulted in problems for the ultimate purchasers of those implements, and that they have damaged Haldrup's reputation among purchasers of such implements in the United States market. (*Id.* at ¶16-¶18.)

---

[2]Haldrup initially sued Emprise Bank, a Kansas-based bank who acted as lender to Kincaid in its purchase of the combines from Inotec. (DE #4; DE #14.) The parties stipulated to dismiss Emprise Bank from this litigation. (DE #17.)

Personal Jurisdiction

Kincaid moves for dismissal of the Amended Complaint based on a lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  As the plaintiff, Haldrup bears the burden of establishing that personal jurisdiction exists, but because the issue is raised in a motion to dismiss, Haldrup need only make a *prima facie* showing of jurisdictional facts.  *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012).  "A district court sitting in diversity has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction."  *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 779 (7th Cir. 2003).  The inquiry into whether an Indiana court would have jurisdiction over the defendant has two steps.  *Id.*  First, the court must decide whether the Indiana long-arm statute subjects the defendant to *in personam* jurisdiction. *Id*.  If so, then the court must determine whether the exercise of jurisdiction comports with federal due process requirements.  *Id*. Indiana's long-arm statute, Trial Rule 4.4(A), provides in part that an Indiana court "may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States."  Ind. Tr. R. 4.4(A).  Trial Rule 4.4(A) "reduce[s] analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the Federal

Due Process Clause." *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006). "Thus, the statutory question merges with the constitutional one – if [Indiana] constitutionally may exercise personal jurisdiction over a defendant, its long-arm statute will enable it to do so." *Northern Grain Marketing, LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014).

For personal jurisdiction to be consistent with due process, a defendant must have established "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984) (internal quotations and citation omitted). A court has general personal jurisdiction over a defendant in any action, even if that action "does not arise out of or relate to the [defendant's] activities in the forum State," where the defendant has sufficient continuous and systematic general contacts with the forum state. *Id*. at 414–16. Haldrup does not argue or allege that the Court has general jurisdiction over Kincaid. As such, Haldrup has "waived any general jurisdiction argument." *RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1277 (7th Cir. 1997).

Haldrup argues that the Court has personal jurisdiction under the doctrine of specific jurisdiction. A court has specific jurisdiction over a nonresident defendant when "a controversy is

related to or 'arises out of' a defendant's contacts with the forum." *Helicopteros,* 466 U.S. at 414 (citation omitted); *see Greving*, 743 F.3d at 492 ("To support an exercise of specific personal jurisdiction, the defendant's contacts with the forum state must directly relate to the challenged conduct or transaction.") (citation and internal quotation marks omitted). This inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121, 188 L. Ed. 2d 12 (2014) (citation and internal quotation marks omitted). Specific jurisdiction is appropriate where (1) the defendant "purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state;" (2) "the alleged injury [arose] from the defendant's forum-related activities;" and (3) the exercise of jurisdiction comports with "traditional notions of fair play and substantial justice." *Felland*, 682 F.3d at 673 (citations omitted).

The "purposeful-availment requirement ensures that a defendant's amenability to jurisdiction is not based on 'random, fortuitous, or attenuated contacts,' but on contacts that demonstrate a real relationship with the state with respect to the transaction at issue." *Greving*, 743 F.3d at 492–93 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)). The constitutionally-required minimum

contacts are not shown merely by aggregating all of a defendant's contact with the forum state because "individuals and corporations must be able to conduct interstate business confident that transactions in one context will not come back to haunt them unexpectedly in another." *RAR, Inc.,* 107 F.3d at 1278. "[T]he action must *directly arise* out of the specific contacts between the defendant and the forum state." *Id.* at 1278 (citation omitted; emphasis in original); *see GCIU-Employer Ret. Fund v. Goldfarb Corp.,* 565 F.3d 1018, 1024 (7th Cir. 2009) ("the proper focus of the analysis is on defendant's conduct and whether plaintiff's claim arises out of that conduct"). Moreover, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Walden,* 134 S. Ct. at 1122 (quoting *Burger King*, 471 U.S. at 475) (internal quotation marks omitted, emphasis in original). "The mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.,* 751 F.3d 796, 801 (7th Cir. 2014) (citation and internal quotation marks omitted).

"[T]he nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue." *Felland*, 682 F.3d at 674. Here, Haldrup's Amended Complaint asserts three breach of contract claims. Counts I and II assert that Kincaid breached purchase order confirmations when

it failed to pay for the CTS-95 combines. Count III asserts that Kincaid "breached the terms of the [MOU]." (DE #16 at ¶35.) "In a breach of contract case, it is only the dealings *between the parties in regard to the disputed contract* that are relevant to minimum contracts analysis." *Felland*, 682 F.3d at 674 (citation and quotation marks omitted; emphasis in original). Courts consider the parties' "'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' in determining whether there were sufficient minimum contacts." *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008) (quoting *Burger King,* 741 U.S. at 479). Courts have considered who initiated the transaction, where the contract was entered into, where the contract was to be performed, and where the contract was negotiated. *Id.* at 762.

Here, Kincaid had no dealings at all with Haldrup regarding the MOU or the order confirmations for the CTS-95 combines; rather, Haldrup's claims are based on Inotec's assignment of its rights to Haldrup. Therefore, the Court will consider Kincaid's relationship with Inotec regarding these agreements. *See Setra of N. Am., Inc. v. Schar*, No. 1:03CV00711, 2004 WL 1554195, *7 (M.D.N.C. July 7, 2004) ("Defendants' reasonable expectations about where they might be expected to defend an action will normally be determined by their relationship with the assignor.").

Kincaid, a Kansas citizen, entered into the MOU and the combine orders with Inotec, a German business located in Germany. Kincaid and Inotec negotiated the terms of the MOU during a meeting in Germany. Kincaid's obligations under the MOU were to be performed in the "North American market," and, as such, were not limited to any specific state. Kincaid ordered the C85 combine and CTS-95 combines from Inotec in Germany. Inotec manufactured the combines in Germany and sent them to Kincaid in Kansas. Kincaid sent its payment for the C85 combine to Inotec in Germany. The CTS-95 combines are currently located in Kansas. None of Kincaid's contacts with Inotec involve the State of Indiana. Because the disputed agreements have no connections to Indiana, the Court concludes that it does not have specific jurisdiction over Kincaid for Haldrup's breach of contract claims. *See U.S. Bank Nat. Ass'n v. Bank of America, N.A.,* No. 1:14-cv-01492, 2015 WL 5971126, at *10 (S.D. Ind. Oct. 14, 2015).

Haldrup argues that Kincaid purposefully availed itself of the privilege of conducting business in Indiana when it sold Haldrup implements to Dow, ABG, and Purdue in Indiana. Haldrup also contends that Kincaid's sales to Purdue are related to this litigation because Kincaid allegedly refused to pay Inotec for the CTS-95 combines in part due to problems with the Haldrup implements that Kincaid sold to Purdue. Haldrup cites two opinions from the Southern District of Indiana to support its position. In *O'Neal*

*v. Bumbo International Trust,* 16 F. Supp. 3d 952 (S.D. Ind. 2014), the plaintiffs sued an infant seat manufacturer to recover damages arising from injuries their daughter sustained after falling out of the seat. The court found personal jurisdiction over the manufacturer under the "stream of commerce theory." *Id.* at 958. Under this theory, a defendant may be subject to specific jurisdiction if it "delivers products into a stream of commerce, originating outside the forum state, with the awareness or expectation that some of the products will be purchased in the forum state." *Id.* (citation omitted). There, the manufacturer's distribution network had several locations in Indiana, and thus, the manufacturer knew that its products would eventually be sold by retailers in Indiana. *Id.* at 959. The court explained that where a defendant utilizes a distribution network for its product sales "with the expectation that they will be purchased by consumers in [Indiana], it has purposefully availed itself of the privilege of conducting business in Indiana." *Id.*

In *Best Chairs Inc. v. Factory Direct Wholesale, LLC,* 121 F. Supp. 3d 828 (S.D. Ind. 2015), plaintiff Best Chairs, Inc. filed suit alleging that the defendant had infringed upon its trademarks. The defendant operated an internet retail store for the promotion and sale of its allegedly infringing "BestChair" products on interactive websites like Amazon.com and eBay.com. *Id.* at 837. In determining the existence of personal jurisdiction, the court

relied upon the purposeful-direction requirements for tort claims. *Id*. at 836 (requiring intentional and allegedly tortious conduct aimed that the forum state with the defendant's knowledge that the plaintiff would be injured in that state) (citing *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010)). The court found personal jurisdiction existed over the defendant because the defendant held itself out on the internet as open to do business in every state, and sold its products to Indiana residents. *Id*. at 837. The Court finds *O'Neal* and *Best Chairs* are distinguishable because Haldrup does not allege that Kincaid utilized a distribution network for its sales in Indiana, or that Kincaid is an internet-based retailer holding itself out as doing business in Indiana.

The Court considers Kincaid's sales in Indiana to be similar to those addressed in *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014). In that case, the plaintiff maintained that the court had personal jurisdiction over the defendant due to the defendant's multiple sales to Indiana residents. The Seventh Circuit found that "[t]he only sales that would be relevant are those that were related to [the defendant's] allegedly unlawful activity" because "[s]pecific jurisdiction must rest on the litigation-specific conduct of the defendant in the proposed forum state." *Id*. at 801. Because the plaintiff had not provided evidence of sales related to the

defendant's alleged wrongful activity, the defendant's sales to Indiana residents did not support specific jurisdiction. *See id*.

Haldrup does not allege that Kincaid's sales to ABG and Dow are related in any way to Haldrup's breach of contract claims. Therefore, those sales do not support personal jurisdiction. Kincaid's sale of Haldrup implements to Purdue is a more complicated issue. Haldrup proffers evidence that (1) Kincaid modified the two Haldrup implements that it sold to Purdue, (2) Purdue complained to Kincaid about problems with those implements, and (3) Kincaid refused to pay Inotec for the CTS-95 combines, at least in part, because of Purdue's problems with those implements. The Amended Complaint alleges breach of contract claims based on Kincaid's alleged failure to pay for the CTS-95 combines.[3] Thus, the problems with the Haldrup implements that Kincaid sold to Purdue appear relevant to the dispute between Kincaid and Inotec over the CTS-95 combines. However, they are insufficient to support personal jurisdiction.

While Kincaid relied upon the problems with the Haldrup implements sold to Purdue in response to Inotec's demand letter,

---

[3] Kincaid urges the Court to disregard "communications about the Purdue implement defects," contending that "[t]here is no legal basis for considering unalleged matters that are outside the scope of the pleadings in this lawsuit." (DE #38 at 10.) But the Seventh Circuit has held that "dealings between the parties in regard to the disputed contract" are relevant to the minimum contacts analysis, without limiting the Court to considering only dealings alleged in the complaint. *Felland*, 682 F.3d at 674.

these sales were too "random, fortuitous, or attenuated" to demonstrate "a real relationship" with the state of Indiana with respect to Kincaid's orders for the CTS-95 combines. *Greving*, 743 F.3d at 493. Kincaid's sales to Purdue initiated from an "annual field day" that Kincaid hosted in Kelley, Iowa, in June 2012, at which Kincaid showed a Purdue representative a Haldrup planter. (DE #38-2 at 3.) Kincaid sold the Haldrup implements to Purdue in Indiana in early 2013, two years before Inotec assigned its rights to Haldrup. (*Id.*) Moreover, Kincaid's sales of the Haldrup implements to Purdue were completely separate from its orders to purchase the CTS-95 combines from Inotec in Germany. Kincaid could not have reasonably anticipated being haled into court in Indiana if Inotec claimed that Kincaid had failed to pay for the CTS-95 combines. *Cf. Citadel Grp.*, 536 F.3d at 764 (finding specific personal jurisdiction where defendant "should have reasonably anticipated being haled into court in Illinois if [plaintiff] ever claimed that [defendant] had failed to pay for obligations incurred" under the parties' agreement). To hold otherwise would allow an interstate business transaction conducted "in one context . . . to haunt [a defendant] unexpectedly in another." *RAR, Inc.*, 107 F.3d at 1278.

Haldrup also relies on Kincaid's demonstration of the modified C85 combine to Tech Services in Indiana to support personal jurisdiction. It is undisputed that Mossberg of Tech

Services saw the C85 combine at Kincaid's trade show booth in Illinois in December 2012, and that Tech Services was interested in purchasing a plow/harvester in 2013. The record is unclear as to whether Tech Services or Kincaid initiated communications after the trade show. Regardless, Kincaid brought the C85 combine to Indiana to demonstrate it to Tech Services in 2013. When Tech Services attempted to operate the C85 combine in fields in Indiana and Illinois, it experienced problems with the combine. The combine was returned to Bluffton, Indiana, to determine the cause of the problems, and Kincaid left it there for more than a month. Haldrup attempts to link Kincaid's demonstration to Tech Services to Count IV, which seeks "a preliminary and permanent injunction precluding Kincaid from demoing, marketing, and/or selling any agricultural implements manufactured by Inotec and/or Haldrup which Kincaid has modified or altered without the express approval of Inotec and Haldrup, including but not limited to [the C85 combine and the CTS-95 combines]." (DE #16 at ¶9, ¶46.)

Kincaid argues that Haldrup cannot bootstrap its request for injunctive relief into an alternate basis for personal jurisdiction. The Court agrees. The "purposeful-direction/purposeful-availment inquiry" depends on the type of claim at issue. *Felland*, 682 F.3d at 674. Count IV does not assert a claim for relief, but rather, is solely a request for a remedy. *See Onyango v. Downtown Entm't, LLC,* 525 Fed. Appx. 458,

460 (7th Cir. 2013) ("An injunction is a type of remedy, as distinct from an underlying claim for relief.") (internal citations omitted).  While the Amended Complaint alleges that Kincaid purchased the C85 combine pursuant to the MOU, modified the C85 combine, and "used it as a demo machine for customers," (DE #16 at ¶9-¶10), it does not allege that Kincaid breached any agreement with Inotec by modifying the C85 combine or using it as a demo machine.  For the sake of argument, the Court assumes that Haldrup's claim that Kincaid breached the MOU (Count III) forms the basis of its request for injunctive relief in Count IV.

As explained above, the factors considered in the purposeful-direction/purposeful-availment inquiry do not support personal jurisdiction over any of Haldrup's breach of contract claims, including Count III.  *See Citadel Grp.,* 536 F.3d at 761-62. Kincaid and Inotec negotiated the terms of the MOU in Germany. The parties' actual course of dealing regarding the MOU was between Kincaid in Kansas and Inotec in Germany.  The record does not indicate that Kincaid and Inotec contemplated future consequences in Indiana; rather, the MOU provided that Kincaid would introduce Haldrup products to "the North American market."  The MOU's only connection to Indiana is based on Inotec's assignment of its rights to Haldrup in Indiana, which is not sufficient.  *See Purdue Research Found.,* 338 F.3d at 780 ("[I]t must be the activity of

the defendant that makes it amenable to jurisdiction, not the unilateral activity of the plaintiff or some other entity.").

Kincaid likens Haldrup's reliance on its request for injunctive relief to an argument rejected in *Advanced Technical*. There, the district court had found personal jurisdiction based on the fact that the defendant knew that the plaintiff was an Indiana company and "could foresee that its [conduct] would harm [the plaintiff] in Indiana." 751 F. 3d at 802. The Seventh Circuit rejected this argument, and reversed the district court's finding of personal jurisdiction. *Id*. at 802-04. Haldrup's request for injunctive relief arguably seeks to prevent foreseeable harm to Haldrup in Indiana. Kincaid insists that personal jurisdiction is even less appropriate here than in *Advanced Technical* because Kincaid's demonstration to Tech Services occurred in 2013, two years before Inotec had assigned its interests to Haldrup. The Court agrees that Kincaid could not have foreseen that its demonstration of the C85 combine to Tech Services would harm Haldrup in Indiana.

Haldrup has failed to establish a *prima facie* case that the exercise of personal jurisdiction by this Court over Kincaid would be appropriate in this case. Even resolving all factual disputes in favor of Haldrup, the record demonstrates that Kincaid could not have reasonably anticipated being haled into court in Indiana if Inotec claimed that Kincaid had breached their agreements. For

the reasons set forth above, the Court determines that it lacks personal jurisdiction over Kincaid.

Transfer of Venue

As an alternative to dismissal for lack of personal jurisdiction, Kincaid moves for venue transfer to the United States District Court for the District of Kansas under 28 U.S.C. section 1406(a). Section 1406(a) provides that a district court may transfer "a case laying venue in the wrong division or district" to a district in which it could have been brought "if it be in the interest of justice." 28 U.S.C. § 1406(a). A district court has the power to transfer a case to an appropriate venue pursuant to Section 1406(a), even if the court has no personal jurisdiction over the defendant. *Hapaniewski v. City of Chicago Heights*, 883 F.2d 576, 579 (7th Cir. 1989). "In considering the 'interest of justice' to transfer a case, a district court may consider such things as the efficient administration of the court system and a forum closer to the action." *Philpot v. Oak Ridge Boys Theater*, No. 1:14-cv-01357, 2016 WL 2997570, at *2 (S.D. Ind. May 24, 2016) (citation omitted); *see Garcia v. LQ Properties, Inc.,* No. 2:15-CV-440, 2016 WL 3384644, at *4 (N.D. Ind. June 20, 2016) (transferring case pursuant to 28 U.S.C. § 1406(a) where plaintiffs' claims would likely be time-barred if the case is

dismissed and because "no purpose is served by forcing [plaintiffs] to file a new complaint and incur a new filing fee").

Because the Court has determined that it lacks personal jurisdiction over Kincaid, venue is not proper in this district.[4] The Court concludes that the appropriate course of action is not to dismiss this case for lack of personal jurisdiction, but rather, to transfer it to a court in which it could properly have been brought. The Court considers this case to be more appropriately filed in the District of Kansas, as it is the domestic location with the strongest connection to Haldrup's breach of contract claims. Kincaid, its counsel, and the CTS-95 combines are all located in Kansas. Haldrup does not argue that venue and jurisdiction would be improper in Kansas; it merely argues that Kansas is not more convenient than Indiana. Accordingly, this case is **ORDERED TRANSFERRED** to the United States District Court for the District of Kansas.

---

[4] Venue is proper in "a judicial district where any defendant resides, if all defendants reside in the same State in which the district is located." 28 U.S.C. § 1391(b)(1). A corporate defendant resides "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." 28 U.S.C. §1391(c)(2). Because the Court has determined that it lacks personal jurisdiction over Kincaid, Kincaid does not "reside" in Indiana, and thus, venue is not proper in this district.

CONCLUSION

For the reasons set forth above, the Court **TRANSFERS** this case to the United States District Court for the District of Kansas, pursuant to 28 U.S.C. § 1406(a), and **DENIES AS MOOT** Kincaid's motion to dismiss (DE #18). The Clerk is hereby **ORDERED** to transfer this matter to the United States District Court for the District of Kansas.


DATED:  **September 1, 2016**          **/s/ RUDY LOZANO, Judge**
                                       **United States District Court**